1  EDWARD H. ARENS (SBN 259155)
     earens@phillipsandcohen.com
2  PHILLIPS & COHEN LLP
   100 The Embarcadero, Suite 300
3  San Francisco, CA 94105
   Tel:  (415) 836-9000
4  Fax:  (415) 836-9001

5  Attorneys for *Qui Tam* Plaintiff

6

7

8                    UNITED STATES DISTRICT COURT

9                   NORTHERN DISTRICT OF CALIFORNIA

10                         SAN JOSE DIVISION

11

12  UNITED STATES ex rel. [UNDER SEAL],          Case No: 5:21-cv-08900-NC

13                    Plaintiff,

14          v.                                    **FIRST AMENDED COMPLAINT FOR
                                                  VIOLATION OF FEDERAL FALSE CLAIMS
15  [UNDER SEAL],                                 ACT**

16                    Defendants.                 **DEMAND FOR JURY TRIAL**

17                                                **FILED IN CAMERA AND UNDER SEAL
                                                  PURSUANT TO 31 U.S.C. § 3730(b)(2)**

18

19

20

21

22

23

24

25

26

27

28

EDWARD H. ARENS (SBN 259155)
  earens@phillipsandcohen.com
PHILLIPS & COHEN LLP
100 The Embarcadero, Suite 300
San Francisco, CA 94105
Tel: (415) 836-9000
Fax: (415) 836-9001

Attorneys for *Qui Tam* Plaintiff

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES ex rel. CATHERINE HUDDLE,<br><br>      Plaintiff,<br><br>  v.<br><br>DRCHRONO, INC., and TEBRA TECHNOLOGIES, INC.,<br><br>      Defendants. | Case No: 5:21-cv-08900-NC<br><br>**FIRST AMENDED COMPLAINT FOR VIOLATION OF FEDERAL FALSE CLAIMS ACT**<br><br>**DEMAND FOR JURY TRIAL**<br><br>**FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)** |

   Plaintiff-Relator Catherine Huddle, through her attorneys, on behalf of the United States of America, for her First Amended Complaint against Defendants DrChrono, Inc. ("DrChrono") and Tebra Technologies, Inc. ("Tebra"), alleges as follows based upon personal knowledge, relevant documents, and information and belief:

## I.  **INTRODUCTION**

   1.  This is an action to recover damages and civil penalties on behalf of the United States of America arising from false and/or fraudulent records, statements and claims made and caused to be made by Defendants and/or their agents and employees, in violation of the federal False Claims Act, 31 U.S.C. § 3729 *et seq.* ("the FCA").

2.      As set forth below, from at least 2014 through the present, Defendants DrChrono and Tebra, software companies that sell electronic health record ("EHR") technology to healthcare providers under the brand names DrChrono EHR and Kareo Clinicals, respectively, have knowingly offered their customers unlawful kickbacks to refer their software to new healthcare providers.  The federal government, which offers incentive payments to healthcare providers who adopt and use certified EHR technology, has paid millions of dollars for the software that DrChrono and Tebra sold through their unlawful schemes.  Each claim for payment that providers submitted to the government as a result of DrChrono's and Tebra's kickbacks is false and fraudulent under the FCA.

3.      DrChrono is a Sunnyvale, California-based company that provides cloud-based EHR technology and services.  DrChrono's products comprise an EHR platform, known as DrChrono EHR, as well as billing, practice management, and patient management software. DrChrono sells its EHR individually and through packaged "plans" bearing names from classical Greece:  Prometheus, Hippocrates, Apollo, and Apollo Plus.  The company claims that thousands of providers across the country are using DrChrono EHR.

4.      This action alleges that DrChrono has offered and continues to offer illegal remuneration, through gift cards and cash, under at least three referral programs in order to generate sales of DrChrono EHR, whether individually or as part of a plan.  DrChrono targets its referral programs to healthcare provider clients, patients, and business partners, respectively. Each program openly offers payment tied to the volume and value of successful referrals, with amounts ranging from $250 to $2,000 per referral.

5.      Tebra is a Newport Beach, California-based software company that provides a range of products and services targeted to independent healthcare practices. Tebra was formed in late 2021, following the merger of Kareo, Inc., a company that sold EHR and billing software, and PatientPop, a company focused on practice growth software.  The combined company sells a certified EHR product and billing services under the Kareo brand, as well as practice growth and marketing services under the PatientPop brand.  Unless otherwise specified, this Complaint refers to Tebra and its predecessors collectively.

6.      Kareo, Inc., was founded in 2004 and developed Kareo Clinical, a cloud-based, certified EHR product, in 2013.  At all relevant times, Tebra has packaged Kareo Clinical with billing software, such as Kareo Billing and Kareo Management Billing, which customers can also purchase separately. Kareo's marketing materials state that it serves over 75,000 healthcare providers, representing over 150,000 active daily users.

7.      Since at least 2015, Tebra has offered and continues to offer illegal remuneration through gift cards ranging between $100 and $300 per referral, the sharing of percentages of revenue from referred accounts, and other gifts and rewards through a program called "Friends of Kareo."  The express purpose of the remuneration is to induce recipients, including healthcare providers and affiliated companies, to refer healthcare providers to Tebra's products and services, including its certified EHR.

8.      DrChrono and Tebra's illegal conduct has caused healthcare providers to submit claims for incentive payments to federal healthcare programs.  Under the Health Information Technology for Economic and Clinical Health Act ("HITECH Act"), the U.S. Department of Health and Human Services ("HHS") established the Medicare and Medicaid EHR Incentive Programs (also known as the "Meaningful Use program"), which provided incentive payments to healthcare providers who demonstrated "meaningful use" of certified EHR technology.  In 2015, Congress replaced the Meaningful Use program with the Merit-based Incentive Payment System ("MIPS"), pursuant to the Medicare Access and CHIP Reauthorization Act of 2015 ("MACRA").

9.      At all relevant times, HHS has certified DrChrono and Tebra's EHRs as meeting the requirements of the Meaningful Use program and MIPS.  Healthcare providers who attested to using DrChrono's or Tebra's EHRs to satisfy Meaningful Use and/or MIPS requirements receive and have received incentive payments (under the Meaningful Use program) and/or avoid and have avoided reductions in their reimbursement from federal healthcare programs (under the MIPS program).

10.     Defendants' conduct is a brazen violation of the Anti-Kickback Statute ("AKS"), 42 U.S.C. § 1320a-7b(b), which makes it illegal to offer renumeration to induce referrals of business payable, in whole or in part, by federal healthcare programs.

11.     Each claim that providers submitted to HHS under the Meaningful Use and MIPS programs is a claim for payment under the FCA.  Because the attestations resulted from DrChrono's and Tebra's violations of the AKS, the claims were false and fraudulent.  In causing the submission of false and fraudulent claims to federal healthcare programs, Defendants violated, and continue to violate, the FCA.  Had HHS known that the claims were false and fraudulent, it would not have made the incentive payments and/or maintained the providers' reimbursement.

12.     The FCA allows any person having information about an FCA violation (referred to as a *qui tam* plaintiff or "relator") to bring an action on behalf of the government, and to share in any recovery.  The FCA requires that the complaint be filed under seal for a minimum of 60 days (without service on the defendant during that time) to allow the government time to conduct its own investigation and to determine whether to join the suit.

## II.     PARTIES

13.     Plaintiff United States of America is the real party in interest.  The United States, acting through HHS, administers the Medicare program, Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395-1395kkk-1 (Medicare), and administers grants to states for Medical Assistance Programs pursuant to Title XIX of the Social Security Act, 42 U.S.C. § 1396 *et seq.* (Medicaid).  The United States, acting through HHS, also administered the Meaningful Use and MIPS programs and a certification program for EHR technology.

14.     *Qui tam* plaintiff/relator Catherine Huddle is a resident of South Carolina.  Relator has nearly twenty years of experience in the EHR industry.  The information set forth in this Complaint is based on her conversations with clients and colleagues in the industry, as well as her own investigation of DrChrono and Tebra.

15.    Defendant DrChrono is a California corporation headquartered in Sunnyvale, California.  Founded in 2009, DrChrono launched its EHR technology in 2011.  The company's EHR technology was first certified for purposes of the Meaningful Use program in June 2011 and remains certified today.  In addition to its EHR, DrChrono offers a practice management application, a revenue cycle management application for providers to manage billing and collections, and a patient-facing application, OnPatient.  OnPatient contains a variety of tools for patients to find providers and manage their healthcare.  DrChrono additionally has partnered with other software developers to integrate their applications on its platform.

16.    DrChrono sells its EHR individually and as part of plans.  The "Prometheus" plan includes the "basic" DrChrono EHR and practice management software. The "Hippocrates" plan includes an "advanced" version of the DrChrono EHR, boasting a number of additional features and integrations, as well as practice management software.  The "Apollo" plan includes the advanced EHR as well as both practice management and billing software.  Lastly, the "Apollo Plus" plan includes the advanced EHR and practice management software, as well as revenue cycle management services.

17.    Defendant Tebra is a California corporation headquartered in Newport Beach, California.  The company was established in 2004 as Kareo, Inc., initially offering web-based medical billing and later expanding into practice management software.  Kareo developed an EHR system which first became Meaningful Use program-certified in February 2013.  Kareo became Tebra in or around November 2021, upon merging with PatientPop, a healthcare marketing company.

18.    Tebra, through the Kareo brand, sells its certified EHR technology as "Kareo Clinical."  The company sells the EHR on an individual or bundled basis, offering a scalable model where customers can add modules including Kareo Billing, Managed Billing (through a Kareo partner), Kareo Engage (handling appointments, scheduling and practice analytics), and Kareo Marketplace (partnering with other companies for customization purposes). These core modules are supported by platform extensions such as Kareo Telehealth, Kareo Patient Collect and Kareo Analytics.

### III.    JURISDICTION AND VENUE

19.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732, the latter of which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§ 3729 and 3730.  Although the issue is no longer jurisdictional after the 2009 amendments to the FCA, to Relator's knowledge there has been no statutorily relevant public disclosure of the "allegations or transactions" in this Complaint, as those concepts are used in 31 U.S.C. § 3730(e), as amended by Pub. L. No. 111-148, § 10104(j)(2), 124 Stat. 119, 901-02.

20.    Moreover, whether or not such a disclosure has occurred, Relator would qualify as an "original source" of the information on which the allegations or transactions in this Complaint are based.  Before filing this action, Relator voluntarily disclosed to the Government the information on which the allegations or transactions in this Complaint are based. Additionally, Relator has direct and independent knowledge about the misconduct alleged herein and that knowledge is independent of and materially adds to any publicly disclosed allegations or transactions relevant to her claims.  Furthermore, this action is not based primarily on any public disclosure that would merit limiting an award to Relator to no more than 10 percent of the proceeds of the action, under 31 U.S.C. § 3730(d)(1).

21.    This Court has personal jurisdiction over the Defendants pursuant to 31 U.S.C. § 3732(a) because that section authorizes nationwide service of process and because the Defendants have minimum contacts with the United States.  Moreover, Defendants can be found in and transact business in the Northern District of California.

22.    Venue is proper in the Northern District of California pursuant to 28 U.S.C. §§ 1391(b)-(c) and 31 U.S.C. § 3732(a) because at all times relevant to this Complaint, Defendants could be found in and have transacted business in this District, and/or because violations of 31 U.S.C. § 3729 *et seq.* alleged herein occurred within this District.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## IV.    DIVISIONAL ASSIGNMENT

23.     Pursuant to Civil Local Rules 3-5(b) and 3-2(c), Relator alleges on information and belief that a substantial part of the events and omissions giving rise to this claim occurred in Santa Clara County, where DrChrono is headquartered.

## V.     STATUTORY AND REGULATORY BACKGROUND

### A.     The False Claims Act

24.     The FCA imposes civil liability on any person who, *inter alia*: (1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government a false or fraudulent claim for payment or approval; (2) knowingly makes, uses or causes to be made or used a false record or statement to get a false or fraudulent claim paid or approved by the Government; or (3) conspires to violate the FCA.  31 U.S.C. §§ 3729(a)(l)(A)–(C).

25.     The FCA defines a "claim" to include "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property that—(i) is presented to an officer, employee, or agent of the United States; or (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest." *Id.* at § 3729(b)(2).

26.     The FCA defines the terms "knowing" and "knowingly" to mean "that a person, with respect to information—(i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information.  *Id.* at § 3729(b)(1)(A).  The FCA does not require proof of specific intent to defraud.  *Id.* at § 3729(b)(l)(B).

27.     The FCA provides that the term "material" means "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." *Id.* at § 3729(b)(4).

28.     Any person who violates the FCA is liable for a mandatory civil penalty for each such claim, plus three times the damages sustained by the Government.  *Id.* at § 3729(a)(l).

### B.    The Anti-Kickback Statute

29.    The AKS provides, in pertinent part:

Whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person—

(A)  to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or

(B)  to purchase, lease, order or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program,

Shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

The Patient Protection and Affordable Care Act (PPACA), Publ. L No. 111-48, 124 Stat. 119 (2010), amended the AKS to provide expressly that "a claim that includes items or services resulting from a violation of this section constitutes a false or fraudulent claim for the purposes of [the FCA]." 42 U.S.C. § 1320a-7b(g).  Congress added this provision to confirm "that all claims resulting from illegal kickbacks are considered false claims for the purposes of civil actions under the [FCA], even when the claims are not submitted directly by the wrongdoers themselves." 155 Cong. Rec. S10854 (Oct. 28, 2009).

30.    The PPACA also clarified that under the AKS's intent requirement, "a person need not have actual knowledge of this section or specific intent to commit a violation" of the AKS in order to be found guilty of a "willful violation." *Id.*

### C.    The Meaningful Use Program

31.    Congress enacted the HITECH Act in 2009 to promote the adoption and meaningful use of certified EHR technology.

32.    Through the Meaningful Use program, CMS and the states make incentive payments to healthcare providers for adopting and demonstrating meaningful use of certified EHR technology. *See* 75 Fed. Reg. 44,314 (July 28, 2010) (noting that the Meaningful Use program "provide[s] incentive payments to eligible professionals (EPs), eligible hospitals and critical access hospitals (CAHs) participating in Medicare and Medicaid programs that adopt and

1    successfully demonstrate meaningful use of certified electronic health record (EHR)

2    technology").

3        33.    Under the Meaningful Use program, "eligible professionals" (including

4    physicians and certain other types of clinicians) could qualify either for up to a total of $44,000

5    over five years from Medicare (subject to sequestration for certain program years and ending

6    after 2016) or up to a total of $63,750 over six years from Medicaid (ending after 2021). Eligible

7    hospitals and critical access hospitals could also qualify under Medicare or Medicaid for

8    incentive payments. Eligible hospital incentive payments started with a $2 million base amount

9    that was adjusted based on the number of hospital discharges and a "transition factor."

10        34.    Healthcare providers could qualify for incentive payments under the Meaningful

11    Use program by attesting each year that they used certified EHR technology and satisfied other

12    program requirements.

13        35.    Healthcare providers also attested that, "by filing this attestation [they were]

14    submitting a claim for Federal funds, and that the use of any false claims, statements, or

15    documents, or the concealment of a material fact used to obtain a Medicare EHR Incentive

16    Program payment, may be prosecuted under applicable Federal or State criminal laws and may

17    also be subject to civil penalties."

18        36.    States imposed substantially similar attestation requirements under the Medicaid

19    EHR Incentive Program.

20    **D.    The Merit-Based Incentive Payment System ("MIPS")**

21        37.    In 2015, Congress enacted MACRA, which replaced the Medicare EHR incentive

22    program with MIPS for physicians and certain other types of clinicians. *See* 42 U.S.C. § 1395w-

23    4(q). Starting in 2017, MIPS consolidated several Medicare incentive programs for clinicians—

24    including the Meaningful Use program—into a single program.

25        38.    Under MIPS, providers may receive increases or decreases to their Medicare

26    payments based on cost and quality of care they provide. Each year, CMS assigns each provider

27    a "performance score" based on measures in four categories: quality, resource use, clinical

28    practice improvement activities, and meaningful use of certified EHR technology. *Id.* § 1395w-

4(q)(2)(A).  The performance score determines whether the provider is entitled to a negative, neutral, or positive adjustment to their future Medicare Part B payments.  CMS applies the adjustments two years after the performance year, such that a provider's performance score in 2019 will affect their payment rate in 2021.

39.    The meaningful use of certified EHR technology may determine up to 25 percent of a provider's performance score in a given year.  *Id.* § 1395w-4(q)(5)(E)(i)(IV) & (E)(ii). CMS assesses providers' meaningful use of certified EHR technology using criteria that are similar to those under the Meaningful Use program.  *Id.* § 1395w-4(q)(2)(B)(iv).

40.    MACRA required HHS to specify the maximum payment adjustment under MIPS for each performance year.  42 U.S.C. § 1395w-4(q)(6)(A).  Over time, the maximum negative adjustment has increased from 4 percent for the 2017 performance year to negative 9 percent for 2020 and subsequent performance years.  *Id.* § 1395w-4(q)(6)(B).  Under statutory budget neutrality principles, the maximum positive adjustment is tied to the amount of the negative adjustments made in the performance year.  MACRA also required HHS to specify an additional positive adjustment for "exceptional performance."  *Id.* § 1395w-4(q)(6)(C).

## VI.    **ALLEGATIONS**

41.    DrChrono and Tebra generate business through referral programs that offer cash and in-kind remuneration to customers who refer their certified EHR technology to other healthcare providers, despite knowing that the federal government subsidizes the cost of that technology through the Meaningful Use and MIPS programs.  Defendants' conduct violates the AKS, which prohibits the offer of remuneration in exchange for the referral of business paid in whole or in part by the federal government, and the FCA, as the federal government would not have paid healthcare providers based on their use of the certified EHR technology had it known that DrChrono and Tebra had induced them to purchase the technology using kickbacks.

### A.    **DrChrono's Violations of the Anti-Kickback Statute**

42.    DrChrono is a software company that sells EHR, practice management, and billing software.  Since at least 2014, DrChrono has generated business through referral programs that offer cash and in-kind remuneration to current customers who refer healthcare

providers to DrChrono.  DrChrono offered the payments to induce sales of DrChrono EHR, both as a standalone product and as part of a software bundle, resulting in millions of dollars in false claims to federal healthcare programs under the Meaningful Use and MIPS programs.

>1.    DrChrono Offers Payment to Healthcare Providers and Patients to Recommend the Purchase of its EHR Technology

43.    From no later than 2014 through the present, DrChrono has offered illegal kickbacks through at least three separate programs.

>a.    The "Colleague Referral Program"

44.    Since at least 2015, DrChrono has operated a "Colleague Referral Program" for physician clients.  Under the program, DrChrono offers in-kind payments to physicians for successful referrals of DrChrono's EHR, whether as a standalone product or as part of a bundled plan.

45.    At all relevant times, the amount that DrChrono offers physicians has been based on the volume and value of their referrals.

46.    In 2015, the program offered physicians a $250 gift card for each referral.  The company explained that "[a]s a client of drchrono, you are eligible to receive a $250 VISA® gift card when you refer another clinic and they become a paid drchrono customer. The only catch? Your referee must use one of our paid plans for three months, you must use the referral form on this page, and the new user must be outside of your practice group."

47.    In 2018, DrChrono revised and expanded the Colleague Referral Program so that the amount it pays for a successful referral increases with the value of the referred purchase.  The company advised its current physician clients that the revised program offered "higher payout, which means more money for you."  Under the revised program terms, which DrChrono markets on its website, physicians could now earn a gift card worth up to $2,000 for referrals that result in an annual contract for one of DrChrono's products:



The amount physicians stand to receive for each referral depends on the plan the referred provider buys. A physician who refers a colleague who buys DrChrono's most expansive plan, Apollo Plus, will receive a gift card amount worth $2,000; a physician whose referral results in the purchase of the next less expansive plan, Apollo, will receive $1,250; and a physician who successfully refers two other plans, Hippocrates and Prometheus, will receive payment of $750 and $500, respectively. DrChrono presents the value-based payment scheme to providers through a table on its website:

| Check out how much you can earn when your colleague signs up for DrChrono | | | |
|---|---|---|---|
| Payment given **based on the plan** purchased by the referral (per provider) | | | |
| **Prometheus*** | **Hippocrates*** | **Apollo*** | **RCM (Apollo+)†** |
| **$500** per provider | **$750** per provider | **$1,250** per provider | **$2,000** per provider |

b.    The "Nominate a Doctor" Program

48.    Since at least 2014, DrChrono has also operated a "Nominate a Doctor" program that offers in-kind remuneration to patients who refer its software to their physicians.

49.    Under the Nominate a Doctor program, DrChrono offers payment to patients based on the volume or value of the business they refer to DrChrono. On its website, DrChrono invites patients using its online portal, OnPatient, to "[e]arn a $250 gift card when you recommend drchrono to a doctor or clinic." To claim a gift card, DrChrono instructed patients to "[t]ell your doctor to give our platform, drchrono, a try and if he or she becomes a paying client, you will receive a $250 gift card for your referral." DrChrono does not limit the number of

successful referrals for which it will make a payment under the program, such that a patient who successfully refers multiple providers to DrChrono will receive higher remuneration than a patient who successfully refers one provider. As DrChrono explains on its website, the "only catch" to its offer is that "your doctor must sign up for a new, paid drchrono plan, keep the plan for at least three months, and must use our referral form." The webpage included an online referral form for patients to complete.

c.    The "Affiliate Network" Program

50.    Since at least 2020, DrChrono has operated a "Affiliate Network" that offers payment for referrals to industry partners. The amount that DrChrono offers under the program is equal to two times the monthly rate of the referred business. Thus, if DrChrono receives $250 a month from a referral, it will pay the affiliate $500. DrChrono's payments under the Affiliate Network program are in cash.

2.    DrChrono Knows that the Federal Government Subsidizes the Cost of its EHR Technology

51.    At all relevant times, DrChrono has known that federal healthcare programs subsidize the cost of its EHR technology.

52.    DrChrono EHR has been certified for purposes of the Meaningful Use program and MIPS since June 2011:

- From June 24, 2011 until April 1, 2016, version 9.0 of DrChrono EHR was certified under ONC Product Number CHP-006488 and ONC-ACB Certification ID: IG-2492-11-0083;

- From July 14, 2014 until June 30, 2020, version 10.0 of DrChrono EHR was certified under CHPL Product Number CHP-023296 and ONC-ACB Certification ID IG-2492-14-0047; and

- From December 27, 2018 through the present, version 11.0 of DrChrono EHR has been certified under CHPL Product Numbers 15.02.02.2897.A083.01.00.0.181227 and 15.02.02.2897.A083.02.01.1.200618.

53.     Dr. Chrono markets its EHR technology based on its certification.  Beginning in 2011, DrChrono has advertised its EHR to providers based on the incentive payments they could receive based on their use.  The company's website, for example, informed providers in 2011 that "[u]sing our iPad EMR system qualifies you for $44,000 in incentives under the HITECH Act."

54.     On the current version of its website, DrChrono encourages potential customers to "Start Attesting and Qualifying for Government Incentives."  Informing customers that "DrChrono is certified as a Complete EHR by the ONC-ATCB," the website states that providers could "[u]se DrChrono in your practice to qualify for government incentives per the HITECH Act."  DrChrono presents potential customers with tables showing the "Max Payout" that providers could receive from using its software.  For 2018 through 2020, the company reported that providers could receive $8,500 annually depending on when they first participated in the incentive program.

55.     The company's executives regularly link its products to the federal government's incentive programs.  In February 2019, for example, DrChrono's Chief Executive Officer, Michael Nusimow, announced the company's latest Meaningful Use certification in a press release, asserting that "[u]nlike legacy EHRs that are not well equipped to keep up with the newest regulatory requirements for reporting and Meaningful Use, we are dedicated to meet[ing] the most updated regulatory compliance requirements and provid[ing] the latest healthcare technologies.  Our commitment is to ensure our partners, physicians, and medical practices are ready for the changes that come with MACRA, MIPS as well as MU Stage 3."

56.     DrChrono also markets a product, Healthmonix's MIPSpro, for providers "to optimize your MIPS or APM score and drive higher Medicare reimbursements."  DrChrono informs providers that MIPSpro is "integrated directly with DrChrono to simplify the reporting process."

57.     Providers have received substantial incentive payments from the federal government based on their use of the DrChrono EHR.  From 2011 through 2015, for example,

healthcare providers using the DrChrono EHR claimed at least $6,802,240 in subsidies under the Medicare program alone:

| Year | Payments |
|------|----------|
| 2011 | $177,496.13 |
| 2012 | $1,578,652.80 |
| 2013 | $2,351,733.13 |
| 2014 | $1,609,096.32 |
| 2015 | $774,943.87 |
| 2016 | $310,317.98 |

58.     Since 2015, providers have continued to attest to the use of certified EHR technology using DrChrono's software, including under the MIPS program.  According to a testimonial on DrChrono's website, one such provider is Ashim Arora, M.D., a pulmonologist based in Simi Valley, California, who participated in the MIPS program using DrChrono's EHR in or around 2018.  On information and belief, healthcare providers have avoided reductions to, and/or claimed increases in, their Medicare Part B reimbursement based on MIPS attestations that reflected the use of DrChrono's software.

59.     On information and belief, many of the providers who claimed incentive payments under the Meaningful Use program and submitted attestations under the MIPS program did so as a result of DrChrono's unlawful referral scheme.

**B.     Tebra's Violations of the Anti-Kickback Statute**

1.     <u>Tebra Offers Payment to Healthcare Providers and Associated Companies to Recommend the Purchase of its EHR Technology</u>

60.     From no later than 2015 through the present, Tebra has offered illegal kickbacks through the following programs:

a.     <u>"Refer a Friend" Program</u>

61.     Since at least March of 2015, Tebra has offered in-kind remuneration to healthcare providers who refer others to purchase Tebra's certified EHR technology.  Tebra originally offered a $300 Amex gift card to providers when they referred a colleague to Kareo

1 Practice Management (Suite Plan) or Kareo Billing Services.  The provider signing up would
2 also receive $100 off their first month's fees.  The "Suite Plan" comprised Kareo's Practice
3 Management solution as well as its certified EHR software.  In a 2015 newsletter, the company
4 promoted the "Referral Program" by inviting providers to "[r]efer your colleagues and you can
5 get paid $300 per referral for each customer you get to sign up for Kareo!"  The company
6 similarly offered a "Friends of Kareo" program, which it described as "a great opportunity to
7 share your story with other practices and get some fun prizes in return."  The company
8 advertised that "when joining Friends of Kareo, you'll receive an awesome gift and start
9 receiving emails about program activities.  Friends of Kareo is a program to thank and reward
10 Kareo customers who share their experience with others and participate in fun activities".  The
11 provider was required to sign up in order to make referrals.

12      62.    By September 2020, Tebra was offering a $100 Amazon gift card each for the
13 current and referred customer.  To be eligible for a gift card, the referred customer must have
14 subscribed to the entire Kareo platform, including Kareo Clinical, within one year of the referral,
15 and must have maintained the subscription for at least 60 days.  This offer is still being
16 advertised today on the Tebra website.

17           b.    Referral Partners Program

18      63.    In addition to referral programs targeting healthcare providers, Tebra has long
19 offered a referral program aimed at other businesses in the healthcare industry, such as billing
20 companies and IT consultants.  This program, known as the Referral Partners program, has run
21 since at least 2008, demonstrating that referral systems have long been central to Tebra's
22 business model.  Tebra has advertised the program as "enabl[ing] companies that introduce
23 Kareo solutions to their clients to earn a percentage of the revenues for referred accounts.  The
24 program is designed to provide partners with supplementary revenue for bringing new customers
25 to Kareo while providing additional value added services or products."

26      64.    The Referral Partners program is by invitation only and requires the referral
27 source to enter into a Referral Program Agreement.  The referral source is required, among other
28 things, "to identify potential demand for Kareo services, to answer any basic questions these

prospects may have about Kareo, and then to send qualified referrals to Kareo for Kareo sales

engagement."  Tebra's website includes a "Kareo Partner Portal" that sets out the types of

organizations and individuals Tebra wants to partner with.  At present, the program is available

to billing companies, IT consultants, "industry leaders," and "affiliates."

65.    Tebra offers specified rates based on the value of each referral.  Under these

"Program Referral Rates," the referring party is generally offered 15% of Tebra's quarterly

revenue for new customers who sign up for Kareo Clinical (EHR), for up to eight quarters.  If the

referring party is an IT consultant, Tebra offers a higher rate, up to a 20% revenue share on all

referrals to Kareo.  There is no limit to the size of payment for each quarter.

66.    Referral sources could receive significant payments through the program.  In

2016, Tebra informed potential participants that

> A referred Kareo customer, using any combination of Kareo Clinical, Kareo Billing, and
> Kareo Marketing, results in recurring quarterly Kareo revenue of $600. The Program
> Participant would earn a referral fee $90 per quarter for up to 8 quarters, payable
> quarterly. . . . For example, if multiple referrals result in new Kareo PM business the
> quarterly recurring Kareo revenue might be $6,000. In this case, the Program Participant
> would earn a referral fee of $900 per quarter for up to 8 quarters, payable quarterly.

2.    Tebra Knows that the Federal Government Subsidizes the Cost of its EHR
Technology

67.    At all relevant times, Tebra has known that federal healthcare programs subsidize

the cost of its EHR technology.

68.    All EHR certifications were developed under Tebra's predecessor, Kareo, Inc.

They have been certified for the purposes of the Meaningful Use and MIPS programs without

interruption since February 2013:

- From February 28, 2013 until March 31, 2016, version 2 of Kareo EHR was

  certified under CHPL Product Number CHP-019082 and ONC-ACB Certification

  ID: 02282013-1328-8;

- From March 14, 2014 until June 29, 2020, version 3.0 of Kareo EHR was

  certified under CHPL Product Number: CHP-022134 and ONC-ACB

  Certification ID: 03142014-2096-6;

- From December 31, 2017 until March 31, 2021, version 4.0 of Kareo EHR was certified under CHPL Product Number: 15.04.04.2777.Kare.04.00.1.171231and ONC-ACB Certification ID: 15.04.04.2777.Kare.04.00.1.171231; and

- From January 1, 2021 through the present, version 4.1 of Kareo EHR was certified under CHPL Product Number: 15.04.04.2777.Kare.04.01.1.210101 and ONC-ACB Certification ID: 15.04.04.2777.Kare.04.01.1.210101.

69.     Tebra has continuously marketed the certified status of its EHR technology and the federal incentive payments that providers will receive by using it.  Tebra's press release advertising the launch of the EHR platform states that "Kareo is certified for use, as a complete EHR, by providers to demonstrate Meaningful Use and to qualify for up to $39,000 in 2013 incentives offered under the American Recovery and Reinvestment Act of 2009."

70.     In approximately February 2013, Tebra prepared a fifteen page "Meaningful Use Qualification Plan" detailing the incentives available and the requirements to meet the Meaningful Use criteria.

71.     Upon achievement of 2015 Edition Certification in January 2018, Kareo issued a press release stating that "Kareo Clinical is designed to reduce clinician burden and helps independent practices take advantages of the positive incentives in Medicare reimbursements available through MACRA compliance."

72.     At present, the EHR product page of the Tebra website states that "enhanced EHR functionality makes it easier for independent medical practices to comply with MACRA and earn positive payment adjustments."  Tebra has a dedicated section of the website for MACRA and MIPS, inviting providers to "get higher MIPS scores and earn more with Kareo" and inviting potential customers who are "interested in learning more about how Kareo can simplify your MIPS reporting process" to schedule a product demo.

73.     Tebra additionally has offered its users "Kareo Meaningful Use Expert Service" that, as explained in a January 2015 newsletter, "offers providers using the Kareo EHR the one-on-one support they need to be successful in achieving Meaningful Use."  In its current form, Tebra promises users "the expert support they need to successfully attest for the Merit-Based

Incentive Program or Medicaid Meaningful Use" for a fee of $600 (basic service) or $2,000 (premium service).

74.    In describing MIPS to providers, Tebra notes the effect of certification on their reimbursement from federal healthcare programs.  According to Tebra, providers who

> [P]articipate in traditional Medicare . . . may earn a performance-based payment adjustment through MIPS.  Starting in 2021, you will see a positive, neutral or negative adjustment ranging from -9% for no participation to +9 for full participation for the performance year. The size of your payment adjustment will depend both on how much data you submit and your performance results.

75.    Providers have received substantial incentive payments from the federal government based on their use of Kareo EHR.  From 2013 through 2016, healthcare providers using the Kareo EHR claimed at least $5,507,341 in subsidies under the Medicare Meaningful Use program:

| Year | Payments |
|------|----------|
| 2013 | $723,296.77 |
| 2014 | $4,210,647.13 |
| 2015 | $466,480.00 |
| 2016 | $106,917.68 |

76.    Since 2015, providers have continued to attest to the use of certified EHR technology using Tebra/Kareo's software, including under the MIPS program.  A number of those providers had also participated in the Meaningful Use program based on Kareo software. At least 129 providers who used Kareo EHR under Meaningful Use continued to take part in MIPS in 2019, and at least 86 such providers in 2020.

77.    On information and belief, many of the providers who claimed incentive payments under the Meaningful Use program and submitted attestations under the MIPS program did so as a result of Tebra's unlawful referral scheme.

**C.    DrChrono and Tebra Have Caused the Submission of False Claims, Records, and Statements**

78.    DrChrono and Tebra knowingly caused their clients to submit false claims for payment under the Meaningful Use program and MIPS resulting from their offer and payment of illegal remuneration to clients, patients, and partners, causing Medicare and Medicaid to pay millions of dollars in incentive payments that were not payable.  DrChrono and Tebra likewise knowingly caused their clients to make and use false records and statements material to false claims in submitting attestations to CMS that omitted the material fact that DrChrono and Tebra had offered illegal kickbacks to induce their purchase of the certified EHR technology.  The omissions were material because violations of the AKS are material under the FCA as a matter of law.

**Count I**

**False Claims Act, 42 U.S.C. § 3729(a)(1)(A), (B) & (C)**

79.    Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 78 above as though fully set forth herein.

80.    Through the conduct alleged above, DrChrono and Tebra knowingly and willfully offered and paid remuneration in violation of the AKS, 42 U.S.C. § 1320a-7b(b)(2), to induce the recipients to refer persons for the furnishing or arranging for the furnishing of DrChrono's and Tebra's EHR products or to induce the recipients to purchase, lease, order, or arrange for or recommend the purchasing, leasing, or ordering of DrChrono's and Tebra's EHR products, for which payment was made in whole or in part under Medicare and Medicaid, each a federal health care program.

81.    As a result of the kickbacks, DrChrono and Tebra knowingly caused healthcare providers to submit claims for federal incentive payments that were false or fraudulent, and not payable, in violation of the FCA, 31 U.S.C. § 3729(a)(1)(A).

82.    As a result of the kickbacks, DrChrono and Tebra knowingly caused healthcare providers to make and use false records and statements material to federal incentive payments, in violation of the FCA, 31 U.S.C. § 3729(a)(1)(B).

83.    In offering and paying kickbacks to healthcare providers for successful referrals, knowing that the referrals would result in claims for payment under Medicare and Medicaid, DrChrono and Tebra knowingly conspired with the providers to violate the FCA, in violation of 31 U.S.C. § 3729(a)(1)(C).

84.    By virtue of these false or fraudulent claims, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

## PRAYER

WHEREFORE, *Qui Tam* Plaintiff-Relator Catherine Huddle prays for judgment against the Defendants as follows:

1.    That Defendants cease and desist from violating 31 U.S.C. § 3729 *et seq*.

2.    That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the United States has sustained because of Defendants' actions, plus a civil penalty for each violation of 31 U.S.C. § 3729;

3.    That Relator be awarded the maximum amount allowed pursuant to § 3730(d) of the FCA.

4.    That Relator be awarded all costs of this action, including attorneys' fees and expenses; and

5.    That Relator recover such other relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relator hereby demands a trial by jury.

Dated:  December 19, 2022

PHILLIPS & COHEN LLP

By:    /s/ Edward H. Arens

Edward H. Arens
Phillips & Cohen LLP
100 The Embarcadero, Suite 300
San Francisco, CA 94105
Tel: (415) 836-9000
Fax: (415) 836-9001

Colette G. Matzzie

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Phillips & Cohen LLP
2000 Massachusetts Ave. NW
Washington, D.C. 20036
Tel: (202) 833-4567
Fax: (202) 833-1815

Attorneys for Plaintiff-Relator Catherine
Huddle.

FIRST AMENDED COMPLAINT
5:21-CV-08900-NC